IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 12 |
| BRUCE LYNN MEINDERS and ) | |
| STACIE JUNE MEINDERS, ) | |
| ) | Bankruptcy No. 14-01459 |
| Debtors. ) | |

**RULINGS ON DEBTORS' CHAPTER 12 PLAN OF REORGANIZATION
AND STATE SAVINGS BANK'S MOTION FOR RELIEF FROM STAY**

These matters came before the Court in Mason City, Iowa. Bradley R. Kruse appeared for Debtors Bruce and Stacie Meinders. Larry S. Eide appeared for Creditor State Savings Bank ("the Bank"). After hearing evidence and argument, the Court took the matters under advisement. The parties filed briefs. These are core proceedings under 28 U.S.C. § 157(b)(2)(G) and (L).

**STATEMENT OF THE CASE**

Debtors seek confirmation of their Chapter 12 Plan of Reorganization ("the Plan"). Debtors run a dairy and crop farming operation. Under the Plan, Debtors would sell a robotic milking machine and use the proceeds to purchase additional dairy cows. The Plan anticipates 50 cows continually producing milk. Debtors would also farm certain parcels of land. Debtors would sell some of this crop and would keep some as feed for the cows. Debtors argue that by concentrating their efforts on milk production, they will be able to make the payments contemplated under the Plan.

The Bank objects to the Plan. The Bank argues that the proposed plan payments on its secured claims are less than the allowed amount of those claims. The Bank also argues that the Plan is not feasible. The Bank argues that the proceeds from the robotic milker will not be enough to purchase the minimum number of the cows needed to support the Plan. The Bank also argues that Debtors have not shown that they will be able to get a dairy license, which is needed to sell milk in Iowa.

The Bank also filed a Motion for Relief from Stay. The Bank argues that it is not adequately protected, that Debtors have sold its collateral without authority and without remitting the proceeds to the Bank, and that Debtors have no equity in the collateral. Debtors argue that the Bank has not shown cause and that the collateral at issue is necessary for an effective reorganization.

After carefully reviewing the evidence and arguments, the Court rules for the Bank on both issues. The Court denies confirmation of the Plan because it is not feasible. The Court also grants the Bank's Motion for Relief from Stay.

## FINDINGS OF FACT

Debtors live on a seven acre farmstead in Kossuth County, Iowa ("the Farmstead"). Before bankruptcy, Mr. Meinders farmed corn, soybeans, and alfalfa.

Before bankruptcy, Debtors had also entered the creamery business. Debtors started Crazy Cow Creamery LLC ("Crazy Cow"). Crazy Cow was not successful. Crazy Cow was not able to meet its financial obligations. Crazy Cow was also unable to meet the applicable regulatory and permitting requirements for creameries in Iowa. Debtors sold Crazy Cow in April 2014. Crazy Cow's failure led to Debtors' bankruptcy.

Debtors filed their Chapter 12 bankruptcy petition on September 19, 2014. Debtors filed the Plan on January 30, 2015. The Plan proposes selling a robotic milker and using the proceeds to buy additional dairy cows. The Plan also has Mr. Meinders continuing to farm corn, soybeans, and alfalfa. Mr. Meinders described the Plan as an effort to consolidate and concentrate his operation on milk production.

The Bank objects to the Plan. The Bank holds mortgages against the Farmstead. The Bank also holds a perfected first lien on all of Debtors' livestock, crops, and business personal property except a John Deere 9600 combine, a John Deere 925 combine platform, and John Deere 843 combine corn head. John Deere Credit holds a purchased money security interest in these three John Deere implements. The Bank also holds a perfected security interest in the business assets of Debtors' company, Meinders Farm Fresh Dairy LLC ("Farm Fresh").

Although Mr. Meinders owns Farm Fresh, it is no longer in operation. Mr. Meinders has personally guaranteed Farm Fresh's debt to the Bank.

At the confirmation hearing, there was a great deal of testimony about the value of the Farmstead and Debtors' farm equipment. The Bank argues Debtors have undervalued both the Farmstead and farm equipment.

Debtors value the Farmstead at $100,000. Debtors argue that it would be worth much less to a potential purchaser than it is to them. Mr. Meinders explained that, in order to effectively use the entire Farmstead, the owner has to encroach on the surrounding farmland. He testified that his father or his mother owns all the surrounding property so he doesn't have this problem. Mr. Meinders testified that they let him encroach on their property as needed to conduct his farming operation, but they would not do so for other purchasers of the property.

Fred Greder, the appraiser for the Bank, valued the Farmstead at $230,000. Mr. Greder acknowledged that "the value conclusion is based on an extraordinary assumption about a possible encroachment situation." Mr. Greder characterized this "encroachment situation" as follows:

> There may be the possibility that the east driveway is not within the boundaries of the legal description. Also, the functional utility of the large loafing shed would be severely restricted . . . because the boundaries are so close to the loafing shed and the cattle shed that it wouldn't be possible to pass in & out of the East ends of those two buildings without driving outside the boundaries of the property being appraised.

4

Mr. Greder testified that he accounted for this situation by reducing his valuation by $10,000.  Mr. Greder based this reduction on his estimate of the cost to acquire an acre of land along the Farmstead's east side.  Mr. Greder noted that this reduction "assumes an amicable negotiation" with the nearby property owners.  Mr. Greder did not consider what the property would be worth if the encroachment problem could not be remedied.  He did testify, however, that the Farmstead's value would be reduced "significantly" if the encroachment problem were not remedied.  Mr. Greder has worked as a farm appraiser for 27 years.  During this time, he has completed 5000–6000 appraisals.  He appraised the Farmstead as of May 14, 2015.  His appraisal report was admitted into evidence as Exhibit LL.

Debtors support their Farmstead valuation of $100,000 with testimony from Monty Branstad. Mr. Branstad has worked as a farmer for 48 years.  He has a large farming operation in the area.  He is familiar with the Farmstead.  Mr. Branstad is also familiar with the market for farm property in the surrounding area.  He knows about the value of farm property in this area because he has purchased five farm properties in the past six years.  He has also been to over a hundred farmland auctions and has priced many different farm properties himself.  Mr. Branstad, however, is not a licensed appraiser.  He acknowledges that he is not an appraiser and that he was not offering a formal appraisal.  Mr. Branstad offered only his estimate that the Farmstead is worth between $65,000 and $95,000.

Although Mr. Greder is a licensed appraiser and Mr. Branstad is not, they nevertheless agreed on key issues like the condition of the Farmstead and factors that reduced its value. They agreed that some buildings on the Farmstead do not add value to the property. They also agreed that there has been some deferred maintenance on the buildings.

Most significantly, both sides agree that most important factor in valuing the Farmstead is the encroachment problem. If the encroachment problem is not resolved, they agree that it reduces the Farmstead's value significantly. The Bank's appraiser suggests that simply purchasing an extra acre on the east side of the Farmstead would solve the encroachment problem. Mr. Meinders testified, however, that his parents own that land and would be unwilling to sell it.

The critical component of the Farmstead's value thus rests almost entirely on whether Mr. Meinders' parents would ever be willing to sell an acre along the east side of the Farmstead, and if so, how much it would cost. Apart from Mr. Meinders' assertion that his parents would be unwilling to sell, there was no other evidence on this issue.

The Court finds that, although valuation cannot be precisely determined on this record, Debtors' appraisal is too low and the Bank's appraisal is too high. The Farmstead's value need not be definitively determined, however. Even if Debtors' valuation is correct, the Plan is not feasible.

The Court also heard evidence on the value of Debtors' farm equipment. Debtors' appraisal of the equipment totaled $135,000. The Bank's appraisal totaled $156,650. Both appraisals need to be adjusted, however, because they did not include all the relevant equipment. The Bank's appraisal did not include the Lely A3 robotic milker, which Debtors value at $35,000. The Debtors' appraisal did not include a Feterl swing hopper, a John Deere 27 stock cutter, and a Knight 1140 spreader. The Banks' appraisal valued these items at $1,200, $1,250 and $10,000, respectively. Testimony also revealed that Debtors' appraiser had the wrong model Brent wagon and undervalued it by $2,000. After adjusting for these discrepancies, the Bank's appraisal would total $191,650 and the Debtors' would total $149,450. Debtors' appraisal was completed three months later than the Bank's. Both appraisers testified that the market for farm machinery has softened since their appraisals.

The Court reaches a conclusion similar to the conclusion on the Farmstead value. The value is somewhere between the appraisals, but need not be definitively decided. Even if Debtors' valuation is correct, the Plan is not feasible.

The Plan proposes selling the robotic milking machine and using the proceeds to buy additional dairy cows. Under the Plan, Mr. Meinders would milk the cows himself and sell the milk. The Plan also anticipates Mr. Meinders supplementing this regular dairy income by selling corn, soybeans, and alfalfa.

Debtors' submitted a cash flow projection to support the Plan. The cash flow projection was admitted into evidence as Exhibit 2. Dan Yegge testified about the cash flow projection. He testified that the cash flow projection assumes that Debtors will have 50 dairy cows continually producing milk. He testified that dairy cows do not produce milk continuously on a year-round basis. He testified that, in order to have 50 cows continually producing milk, a dairy producer would need 55–57 dairy cows. Mr. Yegge testified that the entire cash flow projection depended on 50 cows continuously producing milk for sale.

Debtors currently have 18 dairy cows. Debtors' plan proposes selling the robotic milker and using the proceeds to purchase the additional dairy cows. The robotic milker is worth $35,000. Mr. Yegge testified that $35,000 would purchase 17 to 22 additional cows. Mr. Meinders testified that $35,000 would purchase 20 to 25 older cows. Even under Mr. Meinders' best-case scenario he would add 25 cows to his current total of 18, for a new total of 43.

Mr. Meinders nevertheless testified that the cash flow projections are reasonable and that he will be able to complete the payments outlined in the Plan. He testified that he won't have trouble milking 50 cows by himself. He also testified that, even if he did not have 50 cows initially, he would eventually be able to acquire additional cows using milk income and by selling "other equipment."

8

He offered no specifics on these issues. He also testified that, although cows do have nonproducing time periods, those periods would probably be later in the year.

Mr. Meinders admitted that he does not currently have a milking license. He attributed this to his current transition to a hand-milking operation. He said that, while he was putting in the milking parlor, the milk production stopped. The stoppage resulted from an Iowa law that does not allow a milk producer to have a robot milking machine and a human milking parlor in the same location. Mr. Meinders contends that, in Iowa, milk producers automatically lose their license if they do not supply raw milk samples to the state each month. Once he starts up his dairy operation again he believes he will be able to get the milk license back. Mr. Meinders testified that his license was revoked in June 2013. He stated that he does not know exactly why it was revoked. He admitted that he did not have a license between June 2013 and May 2014.

The Court finds that Mr. Meinders has taken an overly optimistic view of the future. There is no evidence to support those optimistic beliefs.

## DISCUSSION

### I.   Plan Confirmation and Feasibility

In order to be confirmed, a Chapter 12 plan must meet all the requirements of 11 U.S.C. § 1225. One of these requirements is that "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. §

1225(a)(6) (2012). This is commonly referred to as the "feasibility" requirement. This Court has previously addressed the feasibility requirement of a Chapter 12 plan.

> To determine the feasibility of a plan, the court must ascertain the probability of actual performance of the provisions of the plan. Feasibility of a debtor's plan is a factual determination. This feasibility standard requires the Court to determine whether the plan offers a reasonable prospect of success and is workable. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.

In re Weber, 297 B.R. 567, 571 (Bankr. N.D. Iowa 2003) (quotation marks and citations omitted). Although the Court will give debtors the benefit of the doubt about feasibility, it will not "blindly confirm a plan which will not cash flow, and which is, therefore, unfeasible." In re Richards, No. 03-02487, 2004 WL 764526, at *3 (Bankr. N.D. Iowa Apr. 2, 2004).

Here, the Plan cannot be carried out "as a practical matter under the facts." Testimony at the confirmation hearing was undisputed that Debtors must have 50 cows continually producing milk for the Plan to cash flow. It was also undisputed that, to have 50 cows continually producing milk, Debtors would need 55–57 cows. Debtors currently have 18 cows.

The evidence showed that, even after selling the robotic milker, Debtors would only be able to purchase somewhere between 17–25 additional cows. Even if the Court were to assume that Debtors could add 25 cows—the high end of these

10

estimates—Debtors would only have 43 cows. This is not enough to meet the milk production needed to support the Plan.

Debtors did not adequately explain how they would acquire the additional cows required to meet the cash flow projections. Debtors' cash flow projection does not mention or provide for purchasing additional cows. Mr. Meinders testified that he could sell "other equipment" to buy cows, but did not identify what equipment would be sold, whether that equipment is needed to meet production anticipated under the Plan, what value the equipment had, or whether the sale proceeds would be sufficient to purchase the additional cows needed. The evidence shows that Debtors would have, at most, 43 cows under the Plan.

With 43 cows, Debtors cannot meet their cash flow projections. With those numbers, and factoring in only a 10% reduction for the cows' inconsistent milk production, Debtors' milk income would drop from the $13,950 a month projected in the Plan, to a real number of $10,798 per month. This reduction of $3,152 per month leads to a reduction in annual cash flow of $37,824. Debtors' cumulative annual cash flow, based on their plan projection with 50 cows, is only $25,201. Thus, Debtors' 43 cow operation would be $37,824 less, leaving an annual deficit of $12,623. The Plan is simply not feasible. This is especially true given that the Court specifically found that Debtors' Farmstead and equipment valuations were too low.

The Court denies confirmation of the Plan because it is not feasible. The Court need not address the other objections to the Plan.

## II.     Motion for Relief from Stay

The Bank has moved for relief from the automatic stay. Section 362(d) allows the Court to modify the automatic stay "for cause, including the lack of adequate protection" or when a debtor lacks equity in property and "such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(1)-(2) (2012). "Creditors are entitled to relief from the automatic stay if the debtor is not making mortgage payments, and if there is insufficient equity in the property to adequately protect the creditor." In re Plymouth Oil Co., No. BR 12-01403, 2013 WL 5786458, at *10 (Bankr. N.D. Iowa Oct. 28, 2013) (quoting Martens v. Countrywide Home Loans (In re Marttens), 331 B.R. 395, 398 (B.A.P. 8th Cir. 2005) (internal quotation marks omitted)). "A decision to grant or deny a motion for relief from the automatic stay is within the discretion of the bankruptcy court." Blan v. Nachogdoches Cty. Hosp. (In re Blan), 237 B.R. 737, 739 (B.A.P. 8th Cir. 1999).

Here, the Bank has shown that cause exists to grant relief from the automatic stay. The Bank has a mortgage on Debtors' farmstead. It also has security interests in Debtors' farm and dairy equipment and livestock. Debtors have made

no payments to the Bank during the pendency of the case. Debtors have no equity in the Bank's collateral and the collateral is depreciating.

Moreover, there is evidence that Debtors have sold some of the Bank's collateral without remitting the proceeds to the Bank. Mr. Meinders admitted during the hearing that, at the time he filed bankruptcy, he had 27 cows and 16 small calves. He testified that, since filing, he sold six cows valued at $6,000 (three other cows died since filing) and sixteen small calves valued at $4,000. Mr. Meinders admitted that he did not pay the proceeds of these sales to the Bank. Debtors have offered no adequate protection for the Bank's secured claims. The Bank is entitled to relief from the automatic stay.

Debtors are correct that the Farmstead, farm and dairy equipment, and livestock are necessary for an effective reorganization. In their brief, Debtors ask for time to amend the Plan before the Court rules on the Motion for Relief from Stay. Debtors do not indicate what amendments they would make to the Plan. Since the confirmation hearing, Debtors have not filed any amendments or modifications to the Plan. Moreover, Debtors have had over a year to put together a confirmable plan. During that time, the Bank's collateral has depreciated, died, or been sold without the proceeds going to the Bank. The fact that the collateral would be necessary for an effective reorganization standing alone is insufficient to deny relief from the automatic stay. Debtors have no equity in this property. In

fact, they appear to be hundreds of thousands of dollars underwater on the Bank's claims. Additional time to amend the Plan is not warranted. The Motion for Relief from Stay is granted.

## CONCLUSION

**WHEREFORE**, confirmation of Debtors' Chapter 12 Plan of Reorganization is DENIED.

**FURTHER**, State Savings Bank's Motion for Relief from Stay is GRANTED.

Dated and entered: April 18, 2016

_____
THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE